## 59917. HODGES-WARD ASSOCIATES, INC. v. ECCLESTONE et al.

Sognier, Judge.

Appellant Hodges-Ward (hereafter Ward), a licensed real estate broker, sued appellees Ecclestone, Bannon and MacKay, purchasers of two office buildings in Atlanta (hereafter Buckhead Towers) and Citizens and Southern Realty Investors (hereafter CSRI), the owners and sellers of the property. Ward seeks to recover a real estate commission allegedly due him, as well as punitive damages, as a result of an alleged conspiracy between the buyers and sellers to deprive him of his commission. The trial court granted summary judgment in favor of all defendants and Ward appeals.

In October, 1977 Ward was contacted by Byrd, a real estate salesman from Florida, about Ecclestone, a prospective buyer for Buckhead Towers. Ward and Byrd were familiar with the property as a result of their dealings with CSRI regarding the sale of the property to another prospective buyer. Ward had had frequent contact with an employee of CSRI, Johnston, who was responsible for providing information about Buckhead Towers to prospective buyers. At

Byrd's request, Ward promptly sent detailed information about the property to Ecclestone, including mortgage and tax information.

Ward's first personal contact with Ecclestone was on November 5, 1977 when Ecclestone came to Atlanta to inspect various real estate. Byrd arranged for Ward to meet Ecclestone and thereafter Ward showed him Buckhead Towers. During the November 5th meeting, Ward told Ecclestone that he (Ward) would look to Ecclestone for his commission since CSRI would not pay a commission. Ward admits that no agreement was ever reached regarding the amount of the commission but discussion between Ward and Ecclestone continued through November and December, 1977 on the subject. At the time of their meeting, Ward encouraged Ecclestone to contact an employee of CSRI personally known to Ecclestone to get additional information about the property which had been unavailable to Ward.

On December 5, 1977 Bannon, Ecclestone's attorney and president of MacKay, Inc., submitted a written offer to Johnston from MacKay, Inc. to purchase Buckhead Towers from CSRI. A purchase contract bearing Bannon and Johnston's signatures was executed on December 19, 1977 and the sale was closed on December 30, 1977 with Bannon, Ecclestone and representatives of defendant CSRI present at the closing. Bannon purchased the buildings as part of a tax-free exchange of properties with Mrs. Ecclestone. Under the exchange agreement MacKay purchased the subject property and swapped it with Mrs. Ecclestone for another property. Thus, Mrs. Ecclestone ended up with the subject property. Mrs. Ecclestone admits that her husband took care of all her properties and that she knew nothing of the details of the transaction, indicating that her husband was acting on her behalf in this transaction; this was unknown to Ward. Ward knew nothing about the closing until January 12, 1978, although he claims that throughout the period between November 5, 1977 until January 12, 1978 he and Ecclestone continued to discuss the commission.

There is some dispute regarding the events that transpired after the Ward-Ecclestone meeting on November 5, 1977. Ward claims that he continued to be in contact with Ecclestone regarding Buckhead Towers; that he called Johnston at CSRI with an offer from Ecclestone and orally registered Ecclestone as his client at that time; that he continued his attempts to obtain further information; and that he continued to talk to Ecclestone about a commission. Ecclestone claims he does not recall any further contact with Ward after their meeting and denies there was any further discussion about a commission.

All parties agree that CSRI owed no commission to Ward. CSRI

also denies knowledge of any discussions regarding a commission between Ward and Ecclestone. Johnston, Ward's contact at CSRI, testified by deposition that he was familiar with Ward as a real estate broker, and that he had frequent contact with Ward from August, 1977 until January, 1978. Johnston recalled having a conversation with Ward sometime in December regarding Ward's relationship to Ecclestone but has no recollection of any offer made in November by Ward on behalf of Ecclestone. Johnston also testified that he submitted an offer from Bannon on behalf of MacKay, Inc. on or about December 2, 1977. It is unclear when Johnston became aware of the relationship existing between Ecclestone, Bannon and MacKay. Johnston's signature as assistant vice president for CSRI appears on the sales contract entered into by Bannon for MacKay, Inc. on December 19, 1977. He also testified that he recalled a conversation with Ward "at some point in time in late December," when he advised Ward that Ecclestone was still "very much in the ball game." Johnston also testified that he had met Bannon at the office of CSRI on or about December 1, 1977, although Ecclestone was not with him at the time.

1. Appellant contends it was error for the trial court to grant summary judgment to all the defendants because there are genuine issues of fact in this case. In order to establish a conspiracy existed to deprive him of a real estate broker's commission, appellant must show that the commission was *earned;* that he, as the plaintiff-broker, has been the procuring or efficient cause of the ultimate sale; and that there has been a wrongful interference with the broker and the purchaser. *Woodall v. McEachern,* 113 Ga. App. 213, 220 (147 SE2d 659) (1966). In determining whether or not a broker was the procuring cause of the sale where there is no exclusive contract to sell, it must be established that (i) the negotiations were still pending between the broker and the prospective purchaser; and (ii) the owner was aware that the negotiations were still pending at the time he consummated the sale. *Mueller Realty v. Tucker Real Estate,* 131 Ga. App. 54, 56 (205 SE2d 61) (1974). *Gibbs v. Nixon,* 154 Ga. App. 463 (268 SE2d 670) (1980). Having shown that plaintiff broker was the procuring cause of the sale, he must then demonstrate that the sellers actually knew that the purchaser may have been procured by the broker. *National City Bank v. Graham,* 105 Ga. App. 498, 507 (125 SE2d 223) (1962); *Booth v. Watson,* 153 Ga. App. 672, 678 (266 SE2d 326) (1980).

Construing the evidence against the movants, as we must on summary judgment, we find that Ward has demonstrated sufficiently that he may have been the procuring cause of the sale and that there is a question of fact whether CSRI knew that he *may* have

procured the purchaser. Conspiracy is usually a jury question and there must be some evidence, direct or circumstantial, to support the claim. *Clayton McLendon, Inc. v. Judge & Co.,* 142 Ga. App. 659 (236 SE2d 683) (1977). There is some evidence here to indicate that CSRI may have interfered with a brokerage relationship. The evidence is in conflict whether CSRI had actual knowledge of Ward's role as a broker for Ecclestone or MacKay, Inc. prior to execution of the sales contract. *Booth v. Watson,* supra. "The law recognizes the intrinsic difficulty of proving a conspiracy . . . The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances . . . 'To show conspiracy it is not necessary to prove an express compact or agreement among the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally and entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or writing they formulated their unlawful objects. It is sufficient that two or more persons in any manner either positively or tacitly, come to a mutual understanding that they will accomplish the unlawful design . . .' " *Nottingham v. Wrigley,* 221 Ga. 386, 388 (144 SE2d 749) (1965).

2. Appellees argue that appellant executed a release as to Johnston from any liability regarding the transaction and thus, they also should be released from liability, since release of one joint tortfeasor operates as a release to all. This argument has no merit. The record discloses no agreement, contract or settlement relative to Johnston which releases him from liability. Appellant was not required to join all possible tortfeasors to recover for damages sustained. The gratuitous assurance by appellant's attorney upon deposing Johnston that he would not be joined in the lawsuit is insufficient to constitute a release as to the other defendants. *Garrett v. Garrett,* 128 Ga. App. 594 (197 SE2d 739) (1973). Hence, summary judgment on the conspiracy claim with regard to all parties was not proper.

3. Appellant's complaint also states a claim in quantum meruit for the value of his services as a real estate broker. When one renders services valuable to another which the latter accepts, a promise is implied to pay the reasonable value thereof. Code Ann. § 3-107. The evidence shows that Ward procured the initial information for Ecclestone on Buckhead Towers, that Ward actually showed Ecclestone the buildings, and that Ward continued to pursue information about the buildings for Ecclestone. Under these circumstances, the jury should have been allowed to decide whether appellant was entitled to any recovery in quantum meruit.

*Sharp-Boylston Co. v Lundeen,* 145 Ga. App. 672, 674 (244 SE2d 622) (1978).

4. Appellees point out that MacKay, Inc., the purchaser of Buckhead Towers, was unaware that Ward had been involved in the transaction in any way and that the ultimate purchaser of the property was Mrs. Ecclestone. However, Bannon, MacKay's representative, admitted he was the Ecclestones' attorney, and Mr. Ecclestone admitted he acted on behalf of Mrs. Ecclestone regarding her properties. It is undisputed that the property purchased by MacKay, Inc. was transferred immediately to Mrs. Ecclestone; it is also undisputed that Bannon knew about the property only through Ecclestone. Thus, Ecclestone was acting as agent for Bannon, MacKay, Inc. and Mrs. Ecclestone, but this fact was not disclosed to Ward until after the transaction had been completed. If an agent does not disclose to the other party with whom he is dealing that he is acting on behalf of a principal, the agent is personally liable and responsible. *Oxford Bldg. Svcs. v. Gresham,* 136 Ga. App. 460 (221 SE2d 667) (1975). Where an agent wishes to avoid personal liability, the duty is on him to disclose his agency, and not on the party with whom he deals to discover it. *Clonts v. Assoc. Dist.,* 132 Ga. App. 558, 559 (208 SE2d 570) (1974). Thus, Ecclestone, as agent for his wife and MacKay, may be liable to Ward on the quantum meruit claim. Summary judgment on this claim was error.

*Judgment reversed. Deen, C. J., and Birdsong, J., concur.*

Argued May 6, 1980 — Decided September 24, 1980 — Rehearing denied October 10, 1980 —

Sam F. Lowe, Jr., Sam F. Lowe, III, for appellant.
William F. Clark, Emmett J. Bondurant, II, M. Jerome Elmore, for appellees.